# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| SHELLY DAUB,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | CASE NO. 5:23-cv-01107<br><br>DISTRICT JUDGE DAVID RUIZ<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Shelly Daub ("Plaintiff" or "Ms. Daub") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disabled Widow's Benefits ("DWB") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should consider the entire record relevant to Plaintiff's knee impairments, should accurately discuss the evidence, and should ensure that his rationale builds an accurate and logical bridge between the evidence and the result.

## I.     Procedural History

Ms. Daub filed applications for DWB and DIB with a protective filing date of September 18, 2020.  (Tr. 15, 105.)  She alleged a disability onset date of March 13, 2020, due to knees, diabetes, and depression.  (Tr. 105, 470-83, 485-89, 512.)  Her application was denied at the initial level (Tr. 308-09) and upon reconsideration (Tr. 328-29).  She requested a hearing.  (Tr. 376-77.)  A telephonic hearing was conducted before an Administrative Law Judge ("ALJ") on December 27, 2021.  (Tr. 273-307.)

The ALJ issued an unfavorable decision on February 1, 2022, finding Ms. Daub had not been under a disability from May 1, 2020, through the date of the decision.  (Tr. 102-126.)  The Appeals Council denied Ms. Daub's request for review on April 5, 2023, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Daub then filed this pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 6, 7, 9).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Daub was born in 1968.  (Tr. 470.)  She was 51 years old on the alleged disability onset date.  (Tr. 118.)  At the time of the hearing, she lived with her adult son.  (Tr. 282.)  She has at least a high school education with past work as a teacher aide and in a composite job as a medical secretary/medical assistant.  (Tr. 118, 303.)

### B.     Relevant Medical Evidence

Although the ALJ identified severe mental and physical impairments (Tr. 108), Ms. Daub bases her appeal on the evaluation of her bilateral knee impairments (ECF Doc. 7, p. 3 n. 1).  The evidence summarized herein therefore focuses on Ms. Daub's bilateral knee impairments.

1.      **Treatment History**

On June 19, 2019, Ms. Daub presented to Anthony Berdis, D.O., at Spectrum Urgent Care after a fall down the stairs.  (Tr. 593, 608-10.)  She complained of bilateral knee pain and trouble bearing weight, but denied locking, catching, or instability.  (Tr. 608, 610.)  She reported a prior right knee arthroscopic surgery and said she was previously told that she needed a knee replacement.  (*Id.*)  Examination findings included normal gait and station, no joint effusion, full extension, limited flexion, no crepitation though range of motion, negative patella grind test, negative anterior drawer test, and stable Lachman's.  (Tr. 610.)  Flexion was limited due to pain and guarding, and McMurray's could not be performed.  (*Id.*)  Bilateral knee x-rays revealed minor to moderate osteoarthritic changes, especially in the medial compartment, worse on the right, with osteophytes in both the medial and lateral facets bilaterally, but no loose bodies. (Tr. 609.)  Ms. Daub underwent a cortisone injection to the left knee but declined an injection in her right knee because past attempts had not provided relief.  (Tr. 610.)  Dr. Berdis diagnosed osteoarthritis of the bilateral knees and recommended knee braces, using assistive devices as needed, compression, elevation when resting, home exercise, rest, ice, and NSAIDs.  (*Id.*)

Ms. Daub presented for an orthopedic follow-up with Mark J. Shepard, M.D., of Spectrum Health on July 23, 2019.  (Tr. 593-95.)  She complained of bilateral knee pain, left worse than right, and complained of both knees giving way since her fall on June 19, 2019.  (Tr. 593).  Physical examination revealed: intact motor strength bilaterally, mild effusion bilaterally, crepitus, tenderness over the anterior aspect of both knees, and significant left knee medial joint line tenderness.  (Tr. 594-595.)  Dr. Shepard noted that her x-rays revealed "moderate to early severe patellofemoral osteoarthritis with mild to moderate joint space narrowing."  (Tr. 595.)  His impression was bilateral knee patellofemoral osteoarthritis with possible left knee medial

meniscal tear.  (*Id.*)  He administered bilateral cortisone injections, advised her regarding conservative treatment, ordered an MRI of left knee for further workup of the possible medial meniscal tear, and recommended a follow-up in a couple of weeks to review the results.  (*Id.*)

On August 5, 2019, Ms. Daub underwent an MRI of the left knee, which revealed: a grade II sprain of the medial collateral ligament, a small meniscus tear, moderate to high-grade chondral thinning and severe chondromalacia, and small joint effusion.  (Tr. 598, 601-02).  Ms. Daub followed up with Dr. Shepard following her MRI on August 7, 2019.  (Tr. 598-600.)  He noted that her MRI revealed a grade II sprain of the proximal MCL, a small medial meniscal tear, and chondral loss.  (Tr. 600.)  He diagnosed unilateral primary osteoarthritis to both knees and a sprain of the medial collateral ligament of the left knee.  (Tr. 599-600.)  Physical examination findings were similar to Ms. Daub's prior visit and Dr. Shepard again injected both knees with cortisone.  (Tr. 600.)  He indicated that the "significant injury" was to Ms. Daub's MCL and fitted her with an MCL brace.  (*Id*.)  He instructed her to continue with the MCL brace for four to six weeks, and indicated her knee should continue to improve; she was instructed to return as needed if her symptoms persisted.  (*Id.*)

Ms. Daub returned for an orthopedic follow-up with Dr. Shepard about a year later, on July 14, 2020, complaining of left knee pain for three to four months and an increase in knee instability over the same time; she was taking meloxicam and Tylenol and using ice, but was not wearing her brace because it was too small.  (Tr. 603.)  She specifically complained of pain causing her to wake at night, knee clicking, and her knees giving way when she was walking.  (*Id.*)  Ms. Daub was noted to be 5'10" tall with a weight of 315 lbs. and a BMI of 45.1.  (Tr. 604.)  Examination of her left knee[1] revealed moderate effusion, painful range of motion, and

---

[1] No examination findings for right knee were provided.  (*See* Tr. 604-05.)

tenderness over the anterior aspect of her knee.  (Tr. 604-605.)  Dr. Shepard noted that Ms. Daub

had significant patellofemoral chondral loss and degenerative changes and recommended

arthroscopic surgery with a partial medial meniscectomy and debridement of the left knee.  (Tr.

605).  The records do not contain evidence that Ms. Daub underwent this procedure.[2]

In April 2021, Ms. Daub attended a weight control appointment with Natasha Koren,

M.D., in anticipation of bariatric surgery.  (Tr. 804.)  Her height was 5'8.75" and her weight was

278 lbs., resulting in a BMI of 41.47.  (*Id.*)  Her initial weight was recorded at 308 lbs. and her

initial BMI was 45.87.  (*Id.*)  Ms. Daub reported that she walked for exercise, about fifteen to

thirty minutes at a time, three to four times per week.  (Tr. 806.)  On examination, she was noted

to be "ambulatory without assistance."  (*Id*.)  She was advised to continue diet and exercise plans

to meet weight loss goals necessary to have surgery.  (Tr. 807.)

On July 28, 2021, Ms. Daub underwent a laparoscopic sleeve gastrectomy, hiatal hernia

repair, liver biopsy, and esophagogastroduodenoscopy.  (Tr. 1007-08.)  She tolerated the

procedure well, without any complications, and was discharged on July 29, 2021.  (Tr. 1010-12.)

On September 7, 2021, Ms. Daub was seen by Brent Grass, APRN, of Community

Healthcare, regarding complaints of a rash on her upper extremities.  (Tr. 1111-14.)  She did not

know the origin of the rash but thought she might have contracted while "working outside in the

flower bed."  (Tr. 1111.)  Ms. Daub was prescribed prednisone.  (Tr. 1113.)  She returned to see

Angela Hissner, APRN, at Community Healthcare on October 8, 2021, for diabetes follow up.

(Tr. 1115-20.)  Her weight was 249 lbs., and her BMI was 36.24.  (Tr. 1118.)

Ms. Daub went to the emergency department at Orrville Hospital on October 16, 2021,

after sustaining a fall, and was seen by Simas Laniauskas, M.D.  (Tr. 1154-55.)  She reported

---

[2] Ms. Daub testified at her December 2021 hearing that she had her "right knee scraped twice to get the arthritis out," but did not describe a similar procedure for her left knee.  (Tr. 296.)

multiple falls in the past several months due to her knees giving out, most recently at 3:00 a.m. that day, but said she was ambulatory despite the fall and that her pain would come and go.  (Tr. 1154.)  She reported being told that she would eventually need knee replacements due to her longstanding history of osteoarthritis.  (*Id.*)  She explained that she had come to the emergency department because her orthopedic surgeon no longer took her insurance.  (*Id.*)  On examination, Ms. Daub demonstrated a good range of motion with no obvious edema and no obvious inflammation over the bilateral knees, and was "able to ambulate without significant difficulty," but had some tenderness with palpation and manipulation.  (Tr. 1155.)  Bilateral x-rays of the knees did not reveal any acute fracture or dislocation.  (Tr. 1155, 1165-66.)  Dr. Laniauskas advised Ms. Daub to use a cane or walker to support herself if her knees continued to give out, and instructed her to follow up with orthopedics.  (Tr. 1154.)

On October 20, 2021, Ms. Daub attended an orthopedic evaluation at Wooster Orthopedic and Sports Medicine, following a referral from Dr. Laniauskas.  (Tr. 1193-96.)  She was seen by Raymond Eshenaur, PA-C, supervised by Steven Widmer, M.D.  (Tr. 1196.)  She reported an injury to her left knee following a fall on October 16, 2021, where she heard a pop.  (Tr. 1193.)  She also reported many falls due to her knees giving out, with the right knee typically being the worst.  (*Id.*)  She also complained of locking and catching in the left knee.  (*Id.*)  She reported losing nearly 120 lbs. following a gastric sleeve procedure earlier that year.  (*Id.*)  Her weight was 245 lbs., and her BMI was 35.6.  (Tr. 1194.)  Physical examination also revealed trace effusion and positive crepitus of the bilateral knees, tenderness to palpation along the medial and lateral joint lines of the bilateral knees, pain surrounding the medial and lateral border of the patella of the left knee, decreased range of motion bilaterally, positive McMurray's examination on the left which reproduced her pain, mild pain with McMurray's examination on

the right, and an antalgic gait.  (Tr. 1194.)  X-rays of the left knee revealed: varus alignment with medial joint space narrowing, mild to moderate medial compartment arthritis, and moderate joint space narrowing with osteophyte formation and subchondral sclerosis in the patellofemoral compartment.  (Tr. 1195.)  X-rays of the right knee revealed: severe patellofemoral osteoarthritis with near bone-on-bone of the lateral joint space of the patellofemoral compartment with osteophyte formation and subchondral sclerosis; medial and lateral joint line tibial plateau and medial lateral femoral condyle.  (*Id*.)

Ms. Daub was diagnosed with: sprain of the left knee, post-traumatic osteoarthritis of both knees, varus deformity of both knees, essential hypertension, and obesity with a BMI of 35.  (Tr. 1195-96.)  PA Eshenaur noted that the first concern was the left knee injury, considering the positive McMurray's examination, joint line tenderness, and Ms. Daub's report of locking and catching in the knee.  (Tr. 1196.)  He ordered an MRI of the left knee to rule out internal derangement, recommended a knee sleeve as needed, and discussed the possibility of a future total knee arthroplasty of the right knee.  (*Id.*)  Because Ms. Daub was unable to use anti-inflammatories in light of her gastric sleeve procedure, she was instructed to use two extra strength Tylenol 500 mg tablets three times daily.  (*Id.*)  Ms. Daub was instructed to follow up with Dr. Widmer for MRI results and further treatment of her bilateral knees.  (*Id.*)

Ms. Daub had an MRI of the left knee on November 2, 2021, at Wooster Orthopedic Sports & Medicine.  (Tr. 1201.)  Findings included:

1.  Undersurface and free edge tear posterior body medial meniscus.

2.  Tricompartment arthropathy.  Cartilage ulceration most conspicuous medial femoral condyle and tibia and medial and lateral trochies. Active subcordical marrow reaction.

3.  Capsulosynovitis.  Debris within the joint space.

7

(*Id.*)  She then returned to Wooster Orthopedic on November 5, 2021, for an evaluation and MRI follow-up.  (Tr. 1197-1200.)  She was again seen by PA Eshenaur, supervised by Dr. Widmer. (Tr. 1199-1200.)  On examination, her bilateral knees were cool to touch without erythema or signs of infection; she had tenderness to palpation along the medial and joint lines of her bilateral knees; her range of motion was limited in the left knee; she had pain surrounding the patellofemoral joint of the right knee and positive crepitus on range of motion; she had a positive McMurray's examination on both knees, and walked with an antalgic gait.  (Tr. 1198.)  Her left knee MRI was noted to reveal a medial meniscus tear, significant chondromalacia in the medial and patellofemoral compartments, significant osteo-edema in the medial tibial plateau consistent with subcortical microfracturing, and osteo-edema in the patella.  (*Id.*)

Ms. Daub's diagnoses included: left knee pain with medial meniscus tear and osteoarthritis; right knee pain with osteoarthritis and previous knee arthroplasty; hypertension; and obesity with previous gastric bypass.  (Tr. 1199.)  Following discussion with Dr. Widmer, PA Eshenaur observed that the MRI revealed much more osteoarthritis in her left knee than was shown in the x-ray, in addition to a medial meniscus tear.  (Tr. 1199.)  PA Eshenaur discussed with Ms. Daub the possibility of a left knee arthroscopy to address the medial meniscus and perform a chondroplasty.  (*Id.*)  However, he noted the amount of arthritis in her left knee and her prior lack of significant relief with conservative treatment, and discussed proceeding with a total knee arthroplasty.  (*Id.*)  If she proceeded with a total knee arthroplasty, PA Eshenaur noted the potential for repeat surgeries due to Ms. Daub's young age.  (*Id.*)  Ms. Daub agreed to contact the office if she decided to proceed with a knee arthroscopy, total knee arthroplasty, or continuing with conservative care.  (*Id.*)

2.     **Opinion Evidence**

i.     **Consultative Examination**

On March 27, 2021, Ms. Daub underwent a consultative examination by Daniel Gonzales, M.D., at the request of the Social Security Administration.  (Tr. 759-61.)  She complained of bilateral knee pain, worse with walking and standing, but said she did not use a cane or walker.  (Tr. 759.)  She explained that she was told at age 18 that her knees would have to be replaced, but that her doctor wanted her to wait as long as possible before having her knees replaced.  (*Id.*)  Her weight was 290 lbs., and her BMI was 43.  (Tr. 760).  On examination, her range of motion was significantly decreased in her bilateral knees upon flexion, left more than right, but there was no focal joint swelling or erythema, and no tenderness to palpation.  (*Id.*)  Her motor strength was normal, except for her left upper extremity and left hip, and her gait was within normal limits with no assistive devices.  (Tr. 760-61.)  X-rays of the bilateral knees revealed mild osteoarthritis on the left and moderate osteoarthritis on the right, most prominent in the lateral compartment.  (Tr. 758.)  Dr. Gonzales concluded:

> The claimant is a 52-year-old female who presents with a history of arthritis of the bilateral knees.  She states that she is trying to put off getting surgery as long as she can.  She continues to have pain which is limiting her function and her ability to work.  She states that she can dress herself and go to the bathroom.  She can only do limited cooking and cleaning at this time.
>
> Based on my evaluation of this claimant I believe she can perform a light level of activity.

(Tr. 761.)

ii.     **State Agency Reviewers**

On April 16, 2021, state agency medical consultant Leon Hughes, M.D., reviewed Ms. Daub's file and opined that Ms. Daub retained the physical residual functional capacity to perform light exertional work with the following additional limitations: never climb ladders,

ropes, or scaffolds; never crawl; frequently climb ramps or stairs; frequently balance, stoop,

kneel, or crouch; and never work at heights or near hazards.  (Tr. 314-16.)

On reconsideration on September 2, 2021, state agency medical consultant Mehr

Siddiqui, M.D., affirmed Dr. Hughes's RFC findings.  (Tr. 335-36.)

## C.    **Hearing Testimony**

### 1.    **Plaintiff's Testimony**

Ms. Daub testified at a telephonic hearing on December 27, 2021.  (Tr. 273.)  She was

represented by counsel.  (*Id*.)  She reported that she was living with her son, a college student, in

a house owned by her daughter.  (Tr. 282.)  She had worked for almost twenty years in Perry

Local Schools, first as a classroom aide in special education and later as an attendant in the

nurse's office, until she became unable to carry equipment or use stairs.  (Tr. 283-84.)

When asked what prevented her from working, she explained that the decline in her

knees was a great obstacle, in addition to her other health conditions.  (Tr. 288.)  She could drive

only for short trips because it was painful to push down on the pedals or sit in the car for too

long; but she could run into the gas station or the Dollar Tree.  (Tr. 282-83.)  While she could lift

ten pounds, she could not walk with ten pounds; she could not trust herself to carry anything

from her car to her house or to carry a load of laundry on the steps.  (Tr. 289.)  She noted that her

mother paid for a small remodel of her house, turning a spare bedroom into a laundry and

bathroom, because of her difficulty climbing stairs.  (*Id.*)  She explained:

> . . . I just couldn't even, you know, carry a load of laundry up or down the steps.
> And to go to the bathroom, I, you know, would wait 'til the last minute because I
> knew going up the steps was gonna be very painful.  And there were even nights
> that I slept in the living room because after I hadn't gone to work, I was in so much
> pain from the walking or the standing and the sit and stand, sit and stand, sit and
> stand that I had to do, I just didn't even bother to go up to the bed, 'cause I just
> could not physically make it up to my bedroom.

10

(*Id*.)

She testified that two different doctors told her she needed a double knee replacement but was young for the surgery.  (Tr. 289-90.)  One doctor reportedly told her she could have a second knee replacement if needed, but the other told her she would be in a wheelchair for the rest of her life if her knee went out again after a knee replacement.  (Tr. 290.)  She described swelling in her knees, saying she iced her knees about three times a week to treat swelling.  (Tr. 291.)  She also described difficulty walking during cold weather, and occasionally used a mobility scooter, for example to attend football games.  (Tr. 292.)  Ms. Daub testified that she used to be much more active, noting that it was painful to sit through a movie or while playing cards.  (Tr. 293.)

Although Ms. Daub lost over 100 pounds following bariatric surgery, she testified that it had not helped her knee pain.  (Tr. 295.)  She explained that her knee pain started when she was 18, and that she was told even then that she would need knee replacements because her "knee grew at an angle and the bones were rubbing together."  (Tr. 295-96.)  She had her right knee "scraped twice to get the arthritis out," but even with her weight loss, she said "I'm just bone on bone and there's just no helping it, whether I'm heavy or lighter."  (Tr. 296.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 303-06.)  The VE classified Ms. Daub's past relevant work as: teacher aide II (semi-skilled, classified at light, and performed at light and medium); and a composite job made up of medical secretary and medical assistant (skilled, light as performed).  (Tr. 303.)  The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience with the residual functional limitations described in the ALJ's RFC determination could not perform any of Ms. Daub's past work, but could

perform representative positions in the national economy, including cleaner, cafeteria attendant, and office helper.  (Tr. 304-05.)

If the ALJ's RFC determination were reduced to sedentary exertion, the VE testified that the hypothetical individual would be unable to perform any of Ms. Daub's past work, and that there would be no transferable skills from her past work to sedentary jobs.  (Tr. 304-05.)  The VE also opined that being off-task more than 15% of the workday or absent more than six times per year would be work preclusive.  (Tr. 305.)

**D.     Function Report**

In October 2020, Ms. Daub completed a function report in support of her application. (Tr. 516-19.)  She described severe knee pain that limited her ability to stand.  (Tr. 514.)  She reported that she prepared meals (with pain), washed laundry, and ran her sweeper.  (*Id*.)  She mostly had groceries delivered and went on only short shopping trips.  (Tr. 515.)  She used a prescription brace and a cane that was suggested by a doctor, and sometimes used a wheelchair. (Tr. 517.)  She did crafts once per month, read about thirty minutes each day, and watched television.  (Tr. 518.)  She could not stand up without support, absolutely could not kneel, and could only stand/walk for a few minutes at a time.  (Tr. 519.)

**III.     Standard for Disability**

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

13

### IV.    The ALJ's Decision

In his February 1, 2022 decision, the ALJ made the following findings:[3]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.  (Tr. 108.)

2.     The claimant has engaged in substantial gainful activity since the alleged onset date; however, there has been a continuous 12-month period during which the claimant did not engage in substantial gainful activity.  (*Id.*)

3.     The claimant met the non-disability criteria for disabled widow's benefits with the prescribed period ending on May 31, 2024.  (*Id.*)

4.     The claimant has the following severe impairments: obesity, status-post gastric sleeve surgery, degenerative disc disease of the thoracic spine, osteoarthritis of the bilateral knees, status-post right knee arthroscopy and left knee meniscal repair ["knee impairments"], type II diabetes mellitus with peripheral neuropathy, major depressive disorder, bipolar II disorder and anxiety disorder.  (*Id.*)

5.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 109.)

6.     The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; never be exposed to hazards such as unprotected heights, dangerous machinery, and commercial driving.  (Tr. 111.)

7.     The claimant is unable to perform past relevant work.  (Tr. 118.)

8.     The claimant was born in 1968 and was fifty-one years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  (*Id.*)

9.     The claimant has at least a high school education.  (*Id.*)

10.    Transferability of job skills is not material to the determination of disability.  (*Id.*)

---

[3] The ALJ's findings are summarized.

11.  Considering the claimant's age, education, work experience, and residual functional capacity there are jobs that exist in significant numbers in the national economy that she can perform, including cashier, food service worker, and housekeeper.  (Tr. 119.)

Based on the foregoing, the ALJ determined that Ms. Daub had not been under a disability, as defined in the Social Security Act, from September 18, 2020, through the date of the decision.  (Tr. 120.)

## V.      Plaintiff's Arguments

Ms. Daub argues, in a sole assignment of error, that the ALJ's finding for light work in the RFC is not supported by substantial evidence.  (ECF Doc. 7, p. 7.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.  The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit has explained: the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-47 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **Sole Assignment of Error: Whether Light Exertional RFC Was Supported by Substantial Evidence**

Ms. Daub argues that the ALJ lacked the support of substantial evidence when he found she had the RFC to perform light exertional work because "the ALJ failed to properly analyze the evidence of Plaintiff's bilateral knee impairments." (ECF Doc. 7, p. 1; *see id.* pp. 7-11 & ECF Doc. 9, pp. 1-3.) In response, the Commissioner argues that a light RFC is supported by substantial evidence since the ALJ "cited medical records showing Plaintiff had essentially normal clinical mobility," performed substantial gainful activity during part of the alleged disability period, "walked for exercise, and worked in her flower garden." (ECF Doc. 8, p. 1.)

A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record." *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.)"; *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Here, the ALJ concluded that Ms. Daub had the physical RFC:

> to perform <u>light work</u> as defined in 20 CFR 404.1567(b) except that the claimant may occasionally operate foot controls with the bilateral lower extremities; the claimant may frequently balance, occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to extreme cold, vibration and loud noise, and must avoid all exposure to unprotected heights, moving mechanical parts and commercial driving.

(Tr. 111 (emphasis added).) In support of this light RFC, the ALJ considered the subjective complaints of Ms. Daub (Tr. 112-13) as well as her self-reported activities of daily living (Tr.

115-16), discussed the findings in her medical records (Tr. 112-14), and assessed the persuasiveness of the medical opinions (Tr. 116-17).

Ms. Daub argues that the ALJ's findings were inadequate to support a light RFC because the ALJ "spoke in general terms without citing all of the relevant evidence, specifically, the most recent physical examination findings."  (ECF Doc. 7, p. 9.)  For example, she notes that the ALJ characterized her physical examination findings as "mostly unremarkable and consistent with his residual functional capacity" when evaluating how obesity would impact her knee impairments. (*Id.* (citing Tr. 109).)  Contrary to that characterization, she observes that her October 2021 physical examination findings "revealed bilateral knee tenderness, crepitus, decreased range of motion bilaterally and an antalgic gait."  (*Id.* (citing Tr. 1194.)

In response, the Commissioner asserts that the ALJ carefully reviewed Ms. Daub's treatment history "which suggested Plaintiff generally had no more than 'mildly adverse' or benign findings," and that "[f]or most of the relevant period—and with relatively sparse medical visits—Plaintiff had tenderness but no gait disturbance at all. . . ."  (ECF Doc. 8, p. 7 (citing Tr. 113, 761, 806, 1155).)  As to the more significant physical examination findings in October 2021 highlighted in Ms. Daub's brief, the Commissioner agrees that "[t]he ALJ did not mention Plaintiff's limp, but he did cite records from the visit, in addition to citing records from just a few days before that showed her gait was normal."  (*Id.*, p. 8 (citing Tr. 113, 1155, 1193, 1194).)

As the parties agree that the ALJ did not address the abnormal physical examination findings from October 2021, the question before this Court is whether his failure to do so ultimately deprived his RFC determination of the support of substantial evidence.  While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the

record in its entirety." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.,* 736 F.2d 365, 366 (6th Cir. 1984)).  The *Rogers* court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history."  *Rogers,* 486 F.3d at 249.

An ALJ need not discuss every piece of evidence for a decision to be supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  But he cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision."  *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  Stated another way, an ALJ may not "cherry pick[] select portions of the medical record" to support his findings, but must perform "a proper analysis of the medical evidence under agency regulations and controlling case law."  *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports"); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("[A]n ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'").

Here, the ALJ discussed Ms. Daub's physical examination findings at various points in his decision.  In addressing the effect of her obesity on her other impairments under Social Security Ruling 19-2p, he found: "Because the physical examinations contained in the record were <u>mostly unremarkable,</u> I do not find that the claimant's obesity either singularly or in

combination with her other medically determinable severe impairments results in limitations greater than those assessed in this opinion."  (Tr. 109 (emphasis added).)  In finding that the record as a whole did not support a contention that her knee impairments would be work preclusive, the ALJ discussed her physical examination findings as follows:

> <u>Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings</u>, including one dated October 8, 2020, which indicated intact gross strength in all extremities, with normal gait and coordination [], one dated March 27, 2021, which indicated reduced range of motion, in the left more than the right knee, but with no tenderness, swelling, a normal gait, reflexes [] and strength [], or one dated October 16, 2021, which indicated some tenderness, but no edema, or inflammation, independent ambulation without significant difficulties, normal sensory function, motor function and good range of motion in all extremities [].

(Tr. 112-13 (emphasis added) (citing Tr. 679, 760-61, 765, 1155).)  In finding the opinions of the state agency medical consultants—that Ms. Daub could perform light work—to be persuasive, the ALJ observed, in pertinent part, that: "Clinical examinations have consistently reported preserved strength and neurological function [], including gait [] and coordination []."  (Tr. 116 (citing Tr. 679, 761, 1155).)

Ms. Daub contends that the above characterizations of her physical examination findings as "mostly unremarkable" fail to account for the examination findings at her orthopedic evaluations in October 2021 (ECF Doc. 7, p. 9; ECF Doc. 9, p. 2), which noted trace effusion, positive crepitus, joint line tenderness, decreased range of motion, positive McMurray's examination, and an antalgic gait (Tr. 1194, 1198).  She argues that the ALJ's failure to address these findings, in the context of the significant diagnostic test findings from October and November 2021 (which the ALJ did acknowledge), amount to a "fail[ure] to acknowledge the overall worsening of Plaintiff's condition since the date of the prior state agency determinations. . . ."  (ECF Doc. 9, p. 2.)  In contrast, the Commissioner argues that the October 2021

examination findings merely demonstrate an "antalgic gait . . . on a single visit," which Ms. Daub has failed to demonstrate to be "incompatible with light work."  (ECF Doc. 8, p. 8.)

Although the question is a close one, the undersigned concludes for the reasons set forth below that the ALJ's failure to address the physical examination findings from the October 2021 orthopedic visits—within the context of the medical records as a whole—deprives his RFC finding of the support of substantial evidence because it is not clear that the ALJ considered the record as a whole in adopting the RFC and because his RFC finding failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Although the ALJ accurately observes that Ms. Daub's orthopedic treatment visits were infrequent, occurring in or around July 2019, July 2020, and October 2021 (Tr. 113), he does not address specific details from those visits that are suggestive of worsening over time.  In August 2019, Ms. Daub was diagnosed with osteoarthritis of both knees and a left MCL sprain, and was advised to use an MCL brace for four to six weeks with the expectation that her knee would improve; she was only to return if her symptoms persisted.  (Tr. 599-600.)  She did not return for nearly a year, complaining in July 2020 that she had suffered left knee pain for three to four months, with increasing instability.  (Tr. 603.)  Arthroscopic surgery was recommended to address patellofemoral chondral loss and degenerative changes.  (Tr. 605.)  Thereafter, she did not return to orthopedic treatment for over a year, until October 2021, when she complained of multiple falls over several months, including a recent fall that sent her to the emergency room. (Tr. 1193-96; *see* Tr. 1154-55.)  She newly complained of locking and catching in the left knee (Tr. 1193), and noted that her prior orthopedic surgeon did not accept her insurance (Tr. 1154).

It was during Ms. Daub's late-2021 orthopedic treatment that an x-ray first revealed severe patellofemoral osteoarthritis in the right knee that was near to bone-on-bone (Tr. 1195)

and an MRI revealed a left medial meniscus tear, significant chondromalacia in the medial and patellofemoral compartments, significant osteo-edema in the medial tibial plateau consistent with subcortical microfracturing, and osteo-edema in the patella (Tr. 1198).  It also was during this late-2021 treatment that her provider discussed not only a possible arthroscopy but also a possible total knee arthroplasty given the amount of arthritis in her left knee, acknowledging the potential need for repeat surgeries in light of Ms. Daub's young age.  (Tr. 1199.)  And it was in the context of these more significant diagnostic findings and treatment recommendations that the abnormal physical examination findings in question appeared.  (Tr. 1194, 1198.)

There is no question that the ALJ accurately described and acknowledged Ms. Daub's significant diagnostic imagery (Tr. 112) and the offer of a total knee arthroplasty (Tr. 113) in late-2021.  But he acknowledged those findings while asserting that the "[c]linical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings."  (Tr. 113.)  In fact, the same significant diagnostic imagery and treatment recommendations coincided with clinical examination findings that were neither mildly adverse nor benign.  (Tr. 1194, 1198.)  By failing the acknowledge that fact—which, in combination with the new imagery and treatment recommendations, may suggest worsening of her impairments— the undersigned concludes that the ALJ selectively parsed the medical records and failed to build a logical bridge between the evidence and the result, thus depriving his RFC finding of the support of substantial evidence.

During the alleged disability period, Ms. Daub was over 50 years old and was classified as an individual closely approaching advanced age.  (Tr. 118.)  If the RFC had limited Ms. Daub to sedentary work—which requires no more than two hours of standing or walking in an eight-hour workday, rather than six hours—the VE testified that she could not perform her past

relevant work and did not have skills that were transferrable to sedentary work.  (Tr. 304-05.)
Because a finding that Ms. Daub was more limited in her ability to stand or walk could result in
an award of benefits, *see* 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 1, Rule 201.14, the
alleged error is harmful and warrants remand.

> For the reasons set forth above, the undersigned concludes that the ALJ's RFC finding
lacked the support of substantial evidence and that the ALJ failed to build a logical bridge
between the evidence and the result.  Accordingly, the undersigned recommends that the
decision be remanded for further proceedings.

### VII.   Recommendation

> For the foregoing reasons, the undersigned recommends that the final decision of the
Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. §
405(g) sentence four, for further proceedings consistent with this Report and Recommendation.
On remand, the ALJ should consider the entire record relevant to Plaintiff's knee impairments,
should accurately discuss the evidence, and should ensure that his rationale builds an accurate
and logical bridge between the evidence and the result.

May 8, 2024

> */s/Amanda M. Knapp*
> AMANDA M. KNAPP
> United States Magistrate Judge

### OBJECTIONS

> Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See*

*Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).